**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ESTATE OF LAMOREE' MOORE, by and through its Administrator, Leonetta Simpson, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ALPHA KAPPA ALPHA SORORITY, INC., et al.,**<br><br>**Defendants.** | **Case No. 26-CV-00902-SPM** |

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

This matter comes before the Court on several Motions to Dismiss filed by Defendants. (Docs. 82, 84, 86, 88, 124). For the following reasons, the Motions to Dismiss are **GRANTED**, and this action is **DISMISSED with prejudice**.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### I. Factual Background

Plaintiffs Estate of LaMoree Moore, by and through its Administrator, Leonetta Simpson, Leonetta Simpson, individually and as next of kin, and Andre Moore, individually and as next of kin, bring this action arising from the death of LaMoree Moore ("Moore").[1] (Doc. 80, ¶¶ 1, 20–22). Plaintiffs allege the following facts,

[1] Although LaMoree Moore and Andre Moore share the same last name, the Court refers to LaMoree Moore as "Moore" because Andre Moore's role in this lawsuit is limited to next of kin.

which the Court treats as true at the motion to dismiss stage. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

Moore tragically died by suicide at the age of twenty-four following an extended period of hazing, harassment, sexual misconduct, psychological abuse, and institutional inaction connected to her participation in Alpha Kappa Alpha Sorority, Inc. ("AKA") while she was enrolled at Southern Illinois University Carbondale ("SIUC"). (*Id.*, ¶¶ 1–2).

Moore transferred to SIUC in 2019 after completing coursework at Southern Illinois University Edwardsville. (*Id.*, ¶ 50). She transferred with the specific intention of joining AKA. (*Id.*). Moore began the AKA initiation process in April 2019. (*Id.*, ¶¶ 2, 51). During this process, Moore was required to perform physical drills, including wall sits, duck walks, planks, and carrying heavy bags while being berated by senior sorority members. (*Id.*, ¶ 51). She also endured physical conditioning drills in the dark, coerced silence, threats of exposure, sleep deprivation, psychological intimidation, and forced isolation from non-sorority peers. (*Id.*, ¶ 52).

Hazing was not limited to AKA members. (*Id.*, ¶ 53). Members of Alpha Phi Alpha Fraternity, Inc. ("APA"), including Defendant Treyonne "Trey" Masaun Rawls, participated in hazing-related incidents despite APA having no formal role in AKA's intake process. (*Id.*). APA members were present during hazing-related gatherings and contributed through verbal commands, intimidation, and sexually suggestive remarks. (*Id.*).

After Moore's formal initiation, she was subjected to what members called a "post-process," which Plaintiffs describe as an abusive continuation of rituals involving emotional, psychological, and sexual coercion designed to enforce submission and silence. (*Id.*, ¶ 56). On or about April 21, 2019, Moore and another initiate, Kyara Rogers, were directed by senior AKA members Deja Trotter and Cushe' Rae'll Blackmon to perform sexually suggestive "lap dances" for male APA members, including Rawls and Defendant Jarelle "Rell" Shipp. (*Id.*, ¶¶ 57–60). This incident was not part of any authorized sorority ritual or sanctioned activity and constituted sexualized hazing, humiliation, and coercion. (*Id.*, ¶¶ 58, 60).

Moore continued to receive hostile and coercive messages after the formal intake process ended. (*Id.*, ¶ 61). Moore told Simpson in October 2019, "I feel like I'm being watched all the time. It's like I pledged to be a prisoner, not a sister." (*Id.*). Moore reached out to older sorority members, including members of Gamma Kappa Omega, hoping they would advocate for her, but her concerns were dismissed, and she was referred to as "unstable" or "crazy." (*Id.*, ¶ 62).

Moore's mental health deteriorated after the hazing and abuse. (*Id.*, ¶ 9). Beginning in late 2019, Moore reported symptoms of mental distress to family and healthcare professionals, including paranoia, depression, and suicidal ideation. (*Id.*). Moore was psychiatrically hospitalized at least four times between 2020 and 2022, and medical records linked her condition to trauma from her sorority experience. (*Id.*).

Moore disclosed the sexual assault during medical treatment. (*Id.*, ¶ 54). On or about January 22, 2022, while hospitalized at SSM Health DePaul Hospital, Moore told medical staff that a man at school put something in her drink and raped her. (*Id.*). Moore further reported that a similar incident had happened again involving a different man at school. (*Id.*). In a January 24, 2022, therapy session, Simpson confirmed that she was aware of Moore's disclosure of sexual assault and reported that the incident occurred around September 2020 and that she suspected Moore may have been drugged. (*Id.*). Furthermore, Moore disclosed during treatment at Touchette Regional Hospital that she had been sexually assaulted by someone affiliated with the sorority, and that other information linked at least one APA member known as "Trey" to the abusive process. (*Id.*, ¶ 55).

On or about January 30, 2020, Moore attempted to confront Defendant Kyara Rogers[2] about the drugging and sexual assault that occurred during or shortly after the pledging process. (*Id.*, ¶ 73). Moore attempted to speak with Rogers multiple times and, after receiving no response, returned sorority gifts Rogers had given her as part of the pledge process. (*Id.*). Rogers then reported Moore to the SIU Police Department, resulting in a police report against Moore. (*Id.*). Moore cooperated with law enforcement and confirmed she had no intention of harming Rogers. (*Id.*). This was a turning point in Moore's isolation and was a part of the pattern of retaliation and neglect against Moore. (*Id.*).

[2] Misnamed in the complaint as Kyara C. Roger. (*See* Doc. 84, p. 1).

Moore withdrew from SIUC in October 2020 and returned home to Florissant, Missouri. (*Id.*, ¶ 74). The abuse and harassment continued after Moore returned to Missouri through text messages, emails, social media communications, GroupMe messages, and Instagram chats in which Moore remained a participant. (*Id.*, ¶¶ 65, 74). These communications contained disparaging and coercive statements and caused Moore ongoing psychological deterioration, mental anguish, and emotional distress across state lines. (*Id.*, ¶¶ 65–66).

Plaintiffs describe the misconduct as a coordinated, multiyear course of conduct involving members of both AKA and APA. (*Id.*, ¶ 76). The abuse was not isolated and did not end with Moore's initiation. (*Id.*). Rather, the abuse continued after Moore returned to Missouri and through November 2022. (*Id.*, ¶¶ 76, 78). Moore's death was the result of a sustained course of physical, psychological, and sexual abuse, coercion, and targeted harassment by multiple individuals associated with AKA and APA. (*Id.*, ¶ 78).

Defendants knew or should have known that Moore was in danger. (*Id.*, ¶¶ 72, 77, 79). From January 2020 through 2022, Defendants, including individual actors and chapter leadership, were repeatedly notified that Moore was experiencing psychotic breaks, expressing suicidal ideation, and had disclosed trauma and an intent to die to family members and providers. (*Id.*, ¶ 72). Also, AKA's national organization, supervising graduate chapter, and local undergraduate chapter were on notice of the abuse through direct emails, hospital records, text messages, social media reports, and whistleblower complaints. (*Id.*, ¶ 79).

Simpson, Moore's mother, communicated with national and regional AKA officers regarding Moore's condition. (*Id.*, ¶¶ 80–88). Simpson contacted AKA officials as early as October 11, 2021, and placed the organization on notice of the psychological trauma Moore was experiencing because of the Membership Intake Process and post-initiation activities at SIUC. (*Id.*, ¶¶ 80–81). In her October 11, 2021, email, Simpson described Moore's mental health deterioration, including psychosis, multiple hospitalizations, and emotional withdrawal, and pleaded with AKA leadership to intervene. (*Id.*, ¶ 81).

On April 13, 2022, Simpson contacted Central Regional Director Bowen regarding "membership surrounding mental health" and requested a phone call because of the sensitivity of the subject matter. (*Id.*, ¶¶ 83–84). During that call, Simpson described Moore's psychiatric collapse, multiple hospitalizations, and suicidal ideation, and emphasized that Moore's trauma stemmed from her involvement in AKA and its culture of hazing, coercion, secrecy, and institutional silence. (*Id.*, ¶ 85). Plaintiffs allege that no meaningful response or follow-up was provided. (*Id.*, ¶ 86).

On November 30, 2022, after Moore's death, Simpson sent a follow-up email to Watkins forwarding her October 2021 message and writing, "This is what I sent you last year. Here we are now." (*Id.*, ¶ 87). Simpson also sent additional emails to Nicole Barrett on December 12, 2022, and again in October 2023, explaining that Moore's emotional and psychological deterioration were due to her experience in AKA and the organization's failure to intervene. (*Id.*, ¶ 88). These communications were part of

Simpson's effort to understand what happened to her daughter and seek accountability. (*Id.*).

Simpson also contacted APA representatives, including T. Byerson, on multiple occasions between 2022 and 2023. (*Id.*, ¶¶ 91–95). These communications concerned the role that APA members affiliated with the Beta Eta Chapter at SIUC played in the psychological and sexual abuse, coercion, and trauma inflicted on Moore. (*Id.*, ¶¶ 91–93). Simpson provided information that Moore had been harassed and intimidated by APA-affiliated individuals during and after her intake into AKA and that those actions contributed to Moore's mental collapse, multiple hospitalizations, and suicide risk. (*Id.*, ¶ 93). APA failed to acknowledge, investigate, or act on Simpson's outreach. (*Id.*, ¶¶ 95–96).

Moore died by suicide at her mother's home in Missouri on November 17, 2022. (*Id.*, ¶¶ 2, 75, 102, 199). Five days before her death, Moore recorded a video on her phone rehearsing the act with the same robe belt, visibly broken and apologizing for failing to withstand Defendants' torment. (*Id.*, ¶¶ 75, 199). Moore's death was caused by Defendants' hazing, harassment, psychological abuse, sexual misconduct, retaliation, and failure to intervene. (*Id.*, ¶¶ 7, 12, 77–79, 204).

The First Amended Complaint asserts eleven counts: wrongful death under Missouri law, survival statute claims under Missouri law, negligent supervision and retention, hazing under Missouri law, negligent entrustment as to AKA, negligent entrustment as to APA, intentional infliction of emotional distress, civil conspiracy, civil conspiracy under a joint-enterprise theory, conspiracy to interfere with civil

rights under 42 U.S.C. § 1985(3), and negligent infliction of emotional distress. (*Id.*, ¶¶ 100–206).

## II. Procedural History

Plaintiffs initiated this action in the Eastern District of Missouri on June 24, 2025. (Doc. 1). Several Defendants moved to dismiss the First Amended Complaint, or for the case to be transferred to this District. (Docs. 82, 84, 86, 88, 124). Plaintiffs Responded, and Defendants Replied. (Docs. 90–94, 96–97, 99–100, 127–28).

On June 12, 2026, Judge Zachary M. Bluestone granted the pending Motions in part, finding that the Eastern District of Missouri was an improper venue and transferring the case to this District. (Doc. 129). Judge Bluestone deferred ruling on the remaining substantive issues raised in the Motions to Dismiss so that this Court could address those issues in the first instance. (*Id.*). The case was transferred to this District on June 29, 2026. (Doc. 131).

## ANALYSIS

At the motion to dismiss stage, a federal court may dismiss an action as untimely "only when a plaintiff's allegations clearly establish that the claims are untimely." *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (citing *Milchtein v. Milwaukee County*, 42 F.4th 814, 822 (7th Cir. 2022)). When adjudicating the timeliness of state-law claims, a federal court applies the statutes of limitations that would be applied in the forum state. *See Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019) (citing *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007)). Similarly, a federal court borrows the

statute of limitations for personal injury actions that would be applied in the forum state for claims brought under 42 U.S.C. § 1985. *Cielak*, 112 F.4th at 477 (citing *Wilson v. Giesen*, 956 F.2d 738, 741 n.4 (7th Cir. 1992)); *see Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006) ("When Congress fails to provide a statute of limitations for a federal claim and [28 U.S.C.] § 1658(a) is not applicable, federal courts must borrow the most analogous statute of limitations from state law."). Because Missouri was an improper venue for this action, and it was transferred to this District pursuant to 28 U.S.C. § 1406(a), this Court applies Illinois law to determine the statutes of limitations or other time limits for the claims. *See Koutsoubos v. Casanave*, 816 F. Supp. 472, 475 (N.D. Ill. 1993).

Although this Court looks to Illinois law to determine the statutes of limitations and other time to file restrictions for the claims, that does not mean that the Court applies the Illinois statutes of limitations and other time to file restrictions. Instead, this Court looks to whether Illinois would apply its own statutes of limitations and other time to file restrictions. *See Kalmich v. Bruno*, 553 F.2d 549, 553 (7th Cir. 1977). It would.

Generally, "in Illinois, '[s]tatutes of limitations are procedural, merely fixing the time in which the remedy for a wrong may be sought, and do not alter substantive rights.'" *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018) (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002)). Where a statute creates a right that did not exist at common law, however, Illinois treats timeliness requirements as substantive "special limitations."

*Demchuk v. Duplancich*, 440 N.E.2d 112, 114 (Ill. 1982). The timeliness requirement in the wrongful death statute is treated as a substantive special limitation. *Mitchell v. United Asbestos Corp.*, 426 N.E.2d 350, 361 (Ill. App. 1981); *Kristan v. Belmont Cmty. Hosp.*, 366 N.E.2d 1068, 1071 (Ill. App. 1977).

Where Illinois treats statutes of limitations as procedural, it will apply its own statutes even if the underlying claims are brought under another state's laws. *NewSpin Sports, LLC*, 910 F.3d at 300 (citing *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 719 (7th Cir. 2018) and *Trustees of Operative Plasterers' & Cement Masons' Local Union Officers & Emps. Pension Fund v. Journeymen Plasterers' Protective & Benevolent Soc'y, Local Union No. 5*, 794 F.2d 1217, 1221 n.8 (7th Cir. 1986)). This means that Illinois would apply its own two-year personal injury statute of limitations to all claims except the wrongful death claim. 735 ILCS 5/13–202.

Although the precise date that each claim accrued is not clear based on the Amended Complaint, the claims accrued by no later than November 17, 2022, the date of Moore's death. (Doc. 80, ¶ 75). Because this case was not filed until June 24, 2025, more than two years later, (*see* Doc. 1), all claims except the wrongful death claim are barred by the statute of limitations and must be dismissed.

Where Illinois treats a timeliness requirement as substantive, as it does for wrongful death claims, it follows the choice-of-law principles outlined in Restatement (Second) of Conflict of Laws (1971) to determine which state's law will control. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 899–905 (Ill. 2007).

Under Restatement (Second) of Conflict of Laws, § 175:

> In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Section 6 provides that when a state has no statutory choice-of-law directive, a judge should consider:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Notably, where the "injury occurred" in § 175 refers not to where the decedent passed, but where the injurious conduct that contributed towards the death occurred. *See McKinney v. A.W. Chesterton Co.*, 2026 IL App (5th) 250228, ¶ 51 (August 11, 2026).

Here, the majority of the alleged tortious conduct occurred in Illinois from April 2019 through October 2020 while Moore was at SIUC. (*See* Doc. 80). Amongst other incidents, while in Illinois, Moore was subjected to (1) physical drills while being berated, (2) physical conditioning drills in the dark, (3) coerced silence, (4) threats of exposure, (5) sleep deprivation, (6) psychological intimidation, (7) forced isolation from non-sorority peer, (8) sexually suggestive remarks, and (9) emotional, psychological, and sexual coercion. (*Id.*, ¶¶ 51–53, 56). Additionally, Moore was directed to preform sexually suggestive "lap dances" for male members of APA and was drugged and sexually assaulted by someone affiliated with her sorority (*Id.*,

¶¶ 54–55, 57–60). Although Moore received electronic communications with disparaging and coercive statements after she returned home to Missouri in October 2020, (*id.*, ¶¶ 65–66, 74), those communications pale in comparison to the Illinois allegations. This creates a presumption that Illinois substantive law applies.

Although Illinois law presumptively controls, the Court must consider whether another state has a more significant relationship under the principles outlined in § 6. Few of the factors are on point in this case, but the Court considers the relevant interests of Missouri in the determination of the timeliness issue. Missouri certainly has a relationship with this case because Moore was a citizen of Missouri and some injurious conduct was directed to Moore while she was in Missouri. Illinois, however, has a more significant relationship to this case because Missouri has no connection to most Parties in this case and the majority of the injurious conduct occurred in Illinois. Illinois has an interest in enforcing its own timeliness rules to protect its citizens and visitors from facing old claims. *See Arrizon v. TransUnion, LLC*, 263 N.E.3d 75, 84 (Ill. App. 2025) (quoting *Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103 (1998)) ("Statutes of limitations are founded upon the premise that, at some point, 'the right to be free of stale claims' prevails over 'the right to prosecute them.'").

In Illinois, wrongful death actions must be filed within two years of the death.[3] 740 ILCS 180/2(d) (2017). Because this action was brought more than two years after Moore's death, it is untimely. (Doc. 1; Doc. 80, ¶ 75).

[3] There are exceptions to this two-year limit that do not apply here. *See* 740 ILCS 180/2(e)–(f).

Although not every Defendant joined a pending Motion to Dismiss, the timeliness issue applies equally to all Defendants. A court may dismiss claims *sua sponte* as to nonmoving defendants where the ground raised by the moving defendants applies equally to the nonmoving defendants and the plaintiff has had an adequate opportunity to respond. *See Malak v. Associated Physicians*, *Inc.*, 784 F.2d 277, 280 (7th Cir. 1986) (Court may grant summary judgment to non-moving parties). Here, Plaintiffs had a full opportunity to respond to the timeliness defense, and the timeliness defect appears on the face of the First Amended Complaint. (Doc. 80). The timeliness problem is not Defendant-specific; it depends on which state's statutes would control the time to file the claims raised.

Accordingly, Counts I through XI are time-barred, and the First Amended Complaint is dismissed in its entirety.

## Conclusion

For the reasons stated above, the pending Motions to Dismiss (Docs. 82, 84, 86, 88, 124) are **GRANTED**. Plaintiffs' First Amended Complaint (Doc. 80) is **DISMISSED with prejudice**. All other pending requests for relief are **DENIED** as moot. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: September 30, 2026**

**STEPHEN P. McGLYNN**
**U.S. District Judge**